# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| STEWART LUBRICANTS & | ) | |
| SERVICE COMPANY, INC., and | ) | |
| SLS WEST, INC., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:00-CV-2845-VEH |
| | ) | |
| CASTROL INDUSTRIAL | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

---

## Memorandum of Opinion

This matter comes before the Court on the Motion for Summary Judgment

(doc. 198) filed by Defendant Castrol Industrial North America, Inc. (hereinafter

"Castrol").[1]  Castrol seeks summary judgment against Stewart Lubricants & Service

Company, Inc., and SLS West (hereinafter referred to collectively as "SLS") as to all

claims asserted in connection with the following customers or potential customers:

Peabody Western ("Peabody"),   Kennecott Utah Copper ("KUC"), Arch West

Virginia ("Arch"), Taft Coal Company ("Taft"), Drummond Ltd. ("Drummond"), and

---

[1]Embedded in SLS's Brief (doc. 203) in Opposition to Castrol's Motion for Summary
Judgment (doc. 198) was a Motion for Reconsideration of the Court's Order of December 15,
2004, granting, in part, Castrol's Motion for Summary Judgment.  This matter will be addressed
in a separate Memorandum Opinion and Order filed contemporaneously herewith.

El Cerrejon.  This case arises out of an April 1, 1996 Distributorship Agreement (hereinafter "Agreement") between Plaintiffs SLS and Castrol.

## Summary of Case[2]

On April 1, 1996, Castrol and SLS entered into the Agreement pursuant to which SLS distributed or re-sold Castrol products in certain areas.  Subsequently, there were several addenda to the Agreement.  In November, 1999, Castrol offered to continue selling grease to SLS in the event that the Agreement was not renewed.  Castrol contends that SLS rejected that offer and that the parties continued to negotiate the terms of their relationship after the expiration of the Agreement.  SLS contends that, subsequent to its rejection of Castrol's offer, it decided to accept Castrol's previous offer.  Therefore, SLS continued to operate under the assumption that there was an agreement in place.[3]  In December, 1999, Castrol informed SLS that it did not intend to renew the Agreement effective April 1, 2000.  After April 1, 2000, Castrol continued to sell Castrol products SLS for certain accounts.  At some point thereafter, the parties' relationship ended.

---

[2]The Court hereby adopts, and sets forth hereinafter as "Summary of Case" and "Statement of Fact", portions of the parties' Joint Status Report in response to this Court's September 15, 2004 Order (doc. 166).

[3]In its December 15, 2004 Order, this Court concluded that Castrol had no obligation to continue selling product to SLS as a contract had not been formed.  The subsequent Motion to Reconsider this decision was denied by the Court.

2

On October 10, 2000, SLS filed this lawsuit, which, by amendment, alleged the following claims: (1) breach of contract on seven different grounds based on the Agreement; (2) fraud; (3) fraudulent suppression; (4) tortious interference; and (5) breach of contract based on the November 12, 1999 letter. Thereafter, Castrol filed five separate motions seeking summary judgment on each of the aforementioned claims.

On December 15, 2004, this Court entered an order (hereinafter "December Order") on Castrol's Motions for Summary Judgment (doc. 183), granting in part and denying in part summary judgment as to Count One,[4] granting summary judgment as to Count Two, granting summary judgment as to Count Three, denying summary judgment as to Count Four, and granting summary judgment as to Count Five.

On April 20, 2005, Castrol filed two motions for summary judgment. On April 21, 2005, the Court entered an Order to Show Cause as to why the motions for summary judgment should not be struck as untimely. In response, Castrol explained that for the first four years of litigation, SLS refused to identify a list of the customer accounts as to which SLS claimed lost sales. SLS also refused to provide Castrol with a calculation of those damages. As a result, on January 19, 2005, this Court

---

[4]The Court granted summary judgment on the breach of contract claim on five grounds and denied it on two grounds.

entered an order instructing SLS to supplement its discovery responses relating to its alleged damages and, as required by Rule 26, to provide Castrol with a computation of damages within seven days. In response, SLS identified ten accounts for which it alleges to have lost a combined total of approximately $13.9 million sales.[5] The Court then re-opened discovery in order for Castrol to take discovery on SLS's new damage claim. The April 20, 2005 motions for summary judgment pertain to the new damage claim and one of the motions is the matter presently before the Court.

The Court has recently entered an order denying SLS's May 27, 2005 Motion for Reconsideration (doc. 203) and, therefore, the Court maintains that Castrol had no obligation to provide SLS with product after the expiration of the Agreement. Accordingly, any allegations premised upon the aforementioned "obligation" will not be considered.

### Relevant Facts[6]

1.      On April 1, 1996, Castrol and SLS entered into Agreement pursuant to which Castrol supplied SLS with certain products and SLS sold those Castrol

---

[5]Castrol contends that such a figure exceeds the damage figure that SLS provided to this Court during the January 14, 2005 hearing by more than $10 million dollars and is more than ten times SLS's total combined income during the four year term of the Distribution Agreement.

[6]Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff. Facts are undisputed unless otherwise expressly noted

products.[7]

2.     SLS asserts that Castrol refused to sell SLS certain Castrol products for the following areas:  Peabody, KUC, and Arch.[8]

3.     Peabody is located in Arizona, KUC is located in Utah, and Arch is located in West Virginia.

4.     Under the Agreement, the Primary Market Area consisted of the entire states of Alabama and Mississippi.  The additional Market Areas consisted of the state of Wyoming, the country of Colombia, and selected mutually agreed upon areas.[9]

5.     The Agreement provided for distribution by Castrol through SLS to other mutually agreed upon areas.  The Agreement also provided that Castrol would not directly contact any SLS customers in the Primary Market Area.[10]

6.     This Court has already held that "there is no evidence that Castrol failed to sell products to SLS during the term of the Agreement." The Agreement ended on April 1, 2000. [11]

---

[7] *See* December 15, 2004 Memorandum Opinion and Order, p.1.

[8] *See* Stewart February 22, 2005 depo., pp. 39-40.

[9] *See* April 1, 1996 Distributorship Agreement.

[10] *Id.* at Sec. IV.F.

[11] *See* December 15, 2004 Memorandum Opinion and Order, p.11.

7.    SLS asserts that Castrol refused to sell product to SLS for use at Taft Coal Company and Drummond, Ltd. after the Agreement ended.[12]

8.    In 1997, SLS initiated communication pertaining to potential business relationship with Peabody, KUC and El Cerrejon.[13]

9.    Mike Marr is a Castrol representative.  Subsequent to his visit with SLS to Peabody, in or around April of 1997, Castrol committed to Peabody that SLS would have Castrol products to meet the needs of that mine site.[14]

10.   In late 1998 or early 1999, Castrol offered Peabody as a stand-alone business.[15]

11.   SLS obtained the Peabody  business in late 2000.[16]  SLS obtained the KUC business in November of 2000.[17]

12.   SLS began discussions with KUC in April 1997.[18] SLS obtained the initial

---

[12]See Stewart February 22, 2005 depo., pp. 59-60 & 342; This Court previously held that "Castrol had no obligation to sell SLS products after March 31, 2000."  *See* December 15, 2002 Memorandum Opinion and Order.

[13] Stewart Affidavit at ¶¶ 12-17, 18-23  (SLS contends that the interference continued throughout the course of the parties' dealings).

[14] *See* Stewart February 22, 2005 depo., p. 91.

[15] *Id.* at pp. 91-2.Castrol does not dispute that it had negotiations and discussions with SLS as to whether to expand the Agreement to other territories;  however, Castrol does dispute that they reached any agreement as to Arizona Utah, or West Virginia.

[16] Stewart Affidavit at 17.

[17] *See* Stewart February 22, 2005 depo., p. 328.

[18] *Id.* at p. 333.

commitment from KUC after Castrol indicated that it would support SLS's efforts.[19]

13. Darrell May, of Arch, and Mr. Stewart, of SLS, discussed Arch's dissatisfaction with its current service provider. May showed interest in SLS opening an office in West Virginia and he discussed a five year contract with Stewart to begin in 1999.[20]

14. Castrol's Mike Marr assured Darrell May that SLS would be able to gear up to open an office in Charleston, West Virginia in order to service Arch's mine sites in and around West Virginia.[21]

15. The Agreement between Castrol and SLS provided the country of Colombia as an additional Market Area.[22]

16. Castrol refused to sell product to SLS for the El Cerrejon mine in Colombia, South America.[23]

17. Castrol admitted that since 1991, when IQA became the Castrol Distributor 2,

---

[19] *Id.* at pp. 328-29.

[20] *Id.* at pp. 223-2.

[21] *Id.* at pp. 217-18.

[22] Distributorship Agreement; Stewart February 22, 2005 depo., pp. 202-03.

[23] Stewart February 22, 2005 depo., p. 205 (Castrol disputes the implication that SLS ever had a contract with El Cerrejon or requested to be supplied with product for any such alleged contract).

Castrol had an "exclusive" contract with IQA to supply product in Colombia.[24]

18.     Subsequent to April 1, 2000, Castrol sent letters to certain of SLS's contract

customers regarding the continued supply of Castrol product.

### Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion, and identifying those

portions of the pleadings or filings which it believes demonstrate the absence of a

genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has

met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings

and, by its own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for

trial.  *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are

---

[24] Salazar depo., pp. 257, 259-63.

irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248;  *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its

initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*,

518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## Analysis

### I.    Count One-Breach of Contract

Castrol commences argument by contending that Peabody Western, Kennecott Utah, and Arch Western Virginia were not designated as additional Market Areas under the Agreement and, therefore, Castrol had no obligation to supply SLS with products for the three territories.[25]  Accordingly, Castrol argues that it could not have breached a contract based on an obligation that did not exist.

Under Alabama law, to establish a breach of contract, a plaintiff must prove: (i) the existence of a contract; (ii) performance by the plaintiff; (iii) the failure of defendant to perform some action required by the contract or the performance of defendant of some action prohibited by the contract; and (iv) damages proximately caused by such breach. *Moundville Lumber Co. V. Warren*, 203 Ala. 488, 83 So. 479 (Ala. 1919).

In support of its argument, Castrol refers to the deposition of  SLS president Mr. Stewart, during which he allegedly conceded that no written agreement existed

---

[25] Brief in Support of Castrol's Motion for Summary Judgment, p. 5.

that designated Peabody, KUC, and Arch as additional Market Areas.[26]  However, this Court finds that the aforementioned testimony is not in fact a concession and, furthermore,  is not conclusive as to whether the foregoing areas were designated as Market Areas.  In a matter such as the one presently before the Court, wherein an express agreement exists as to the relationship and obligations between and among the parties, the Court  would generally rely on the four corners of the agreement to make its determinations.  However, in this particular case, the Agreement on its face fails to provide any direction as to the proper procedure for designating additional  Market Areas.[27]  The provision of the Agreement pertaining to the designation of additional Market Areas simply *permits* designation upon mutual agreement; however, it fails to provide instruction on the procedure by which such designations are made.[28]  The absence of explicit instruction prevents the Court from concluding, as a matter of law, whether or not the areas were in fact designated additional Market Areas.  Accordingly, the Court finds that there exists a genuine issue of material fact as to whether the territories in question were in fact mutually agreed upon additional Market

---

[26] *See* Stewart February 22, 2005 depo.

[27]SLS contends that based upon Castrol's statements of confirmation, conduct, and the language of the Agreement, the Territories were "mutually agreed upon" Additional Market Areas.

[28]*See* Distributorship Agreement, p.7.

Areas under the terms of the Agreement.  Therefore, it remains a  question of fact reserved for the jury and the Court shall refrain from such decision-making.

However, for the purpose of summary judgment determination, the Court must accept the evidence in the light most favorable to the non-moving party; therefore, the Court will accept that the territories were mutually agreed upon designated additional Market Areas and, therefore, within the purview of the Agreement.[29]

<u>Peabody, Kennecott, and Arch</u>

SLS asserts that Castrol breached the Agreement by failing to sell SLS product for use at  Peabody, Kennecott, and Arch *during* the term of the Agreement.[30]  As discussed above, there is a genuine issue of material fact as to whether the above three areas were designated as additional Market Areas and thereby fall within the scope of the Agreement.  However, in its Order, the Court determined that Castrol did not fail to sell SLS any product during the term of the Agreement.[31]  Because this argument is set forth in the Court's recent Memorandum Opinion in response to SLS's Motion

---

[29]In its December 2004 Order, the Court accepted as true for summary judgment purposes SLS's interpretation of the Distributorship Agreement that the Distributorship Agreement created an exclusive distributorship relationship between SLS and Castrol as to all products listed in Exhibit A, both as to industrial accounts in the Primary Market Area and accounts in the Additional Market Area, so long as those accounts were for "Surface and Deep Mining and selected industrial accounts." December Order p. 8.

[30] *See* SLS's Response Brief in Opposition of Castrol's Motion for Summary Judgment, p. 15.

[31]  *See* December 15, 2004 Memorandum Opinion and Order, p.11.

to Reconsider, the Court will refrain from articulating duplicate arguments and summary judgment is due to be **GRANTED** as to any alleged failure to sell product during the term of the Agreement in connection with these three mines.[32]

Taft and Drummond

SLS asserts that Castrol breached the Agreement by failing to sell SLS product for use at Taft and Drummond during a period of time *after* the expiration of the Agreement. This Court has already concluded that Castrol's November 12, 1999 letter to SLS communicating its intent to supply SLS with product after the termination of the Agreement was not a contract.[33] Accordingly, Castrol was under no obligation to sell SLS product after the March 31, 2000 expiration of the Agreement and summary judgment is due to be **GRANTED** as to the breach of contract claim as it pertains to Taft and Drummond. [34]

El Cerrejon

SLS alleges that Castrol is liable for breach of contract because it contacted

---

[32]This Court will not address the argument pertaining to oral modifications of contracts as it applies to SLS's Motion to Reconsider which has been decided by the Court separately.

[33] *See* December 15, 2004 Memorandum Opinion and Order, p.16.

[34] This Court will not address the argument pertaining to implied modifications of contracts, which is premised upon the Court's reconsideration of its December 15, 2004 Order as the Court has already decided the Motion to for Reconsideration separately.

customers and potential customers of SLS during the term of the Agreement.[35]  In

particular, SLS contends that Castrol had direct contact with the El Cerrejon mine

during the term of the Agreement, which is strictly prohibited under the Agreement.[36]

The Agreement reads in pertinent part: "PLD[37] undertakes and agrees to:

Refrain from any contact with the DISTRIBUTOR'S customers in the Primary Market

Area...".[38]   Assuming, for the sole purpose of determining the appropriateness of

summary judgment on this claim, that the same provisions that pertain to Primary

Market Areas apply to additional market areas as well, the Court finds that the

Agreement clearly prohibited such conduct by Castrol.[39]

Based upon the complete record, the Court finds that there is sufficient evidence

from which a jury could find that Castrol violated the Agreement by making an

exclusive distributorship agreement for territories in Colombia with IQA while having

---

[35] *See* SLS's Response Brief in Opposition to Castrol's Motion for Summary Judgment, pp. 17-18.

[36] *Id.*

[37] Castrol has a place of business at its Performance Lubricants Division.  Henceforth, the responsibilities of PLD are identical to those of Castrol insofar as the Agreement is referenced. Distributorship Agreement .

[38] *See* Distributorship Agreement, p. 6.

[39] The Court continues to interpret the Agreement in the light most favorable to the non-movant.  Therefore, the Agreement created "an exclusive distributorship relationship between SLS and Castrol as to all products listed in Exhibit A, both as to industrial accounts in the Primary Market and accounts in the Additional Market accounts, so long as those accounts were for 'Surface and Deep Mining and selected industrial accounts.'" December 15, 2004 Order.

an exclusive distributorship agreement in existence with SLS for the same area.

Furthermore, Mr. Stewart testified that Castrol was secretly feeding information about

El Cerrejon to IQA.   The Court concludes that the evidence is sufficient to show that

a genuine issue of material fact exists as to whether Castrol's conduct amounted to a

breach of contract.   Accordingly, Castrol's Motion for Summary Judgment for breach

of contract as it pertains to El Cerrejon is due to be **DENIED**.

## II.____Count Two- Tortious Interference

SLS alleges that over the course of the relationship between Castrol and SLS,

Castrol engaged in a pattern and practice of tortious interference with SLS's business

relations with Peabody, KUC, Arch, Taft, Drummond, and El Cerrejon.[40]

SLS contends that Castrol developed a pattern and practice of encouraging SLS

to pursue additional Market Areas and to make contacts and receive commitments

from customers; and, shortly after doing so, Castrol would eliminate SLS from the deal

in order for Castrol to sell directly to those customers.[41]

Alabama law recognizes the tort of intentional interference with business

relationships, including prospective business relationships.   In order to prevail on such

---

[40] *See* SLS's Response Brief in Opposition to Castrol's Motion for Summary Judgment, p. 19.

[41] *Id.*

16

a claim, a plaintiff must prove: (1) the existence (or prospect) of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) proximate damages. *See Ex parte Alabama Dept. of Transportation*, 764 So. 2d 1263, 1270 (Ala. 2000). "It is the right to do business in a fair setting that is protected." *Utah Foam Products v. Polytec*, 584 So.2d 1345, 1352-1353 (Ala. 1991).

<u>Peabody, KUC, and Arch</u>

As the basis of its Motion for Summary Judgment, Castrol argues that it is "undisputed" that the Agreement did not extend to Peabody, KUC, and Arch and, therefore, Castrol's alleged failure to do what it had no legal obligation to do does not give rise to a tortious interference claim.[42]   However, the Court has already concluded that the matter of whether the areas were within the scope of the Agreement is clearly in dispute.

Furthermore, the Court finds that the claim for tortious interference is not grounded strictly in Castrol's alleged failure to supply SLS with product but, in fact, is based on Castrol's alleged attempt to solicit business from potential customers of SLS all the while knowing that, based on Castrol's assurances,  SLS was under the distinct impression that Castrol would supply SLS with product and support it needs

---

[42] Castrol's Brief in Support of its Motion for Summary Judgment, p. 9.

so it could acquire the business.[43]  Castrol's commitment to both SLS and the potential

customers of SLS  to supply SLS with Castrol product resulted in pecuniary damages

to SLS when Castrol subsequently denied SLS the product in its attempt to do business

directly with the customers.[44]  According to the record, this conduct resulted in a loss

of product sales and service income to SLS.[45]

    The Court is particularly concerned with the evidence of business solicitation

meetings with and discussions among Castrol representatives, the representatives of

SLS, and those of  Peabody, KUC, and Arch.[46]  The Alabama Supreme Court has

recognized that "Utah Foam continually gave the outward appearance of playing a role

of assistance toward Polytec, but the jury could conclude that Utah Foam at every

opportunity sought to turn Teledyne away from Polytec and to secure the job for

itself." *Utah Foam Products v. Polytec, Inc.,* 584 So.2d 1345, 1353 (Ala. 1991).

During the solicitation meetings, Castrol allegedly assured Peabody, KUC, and Arch

---

[43]The Court notes that Castrol attempted to elicit the grounds for such claim from Stewart in his deposition, however, that response alone does not overcome the other evidence that the argument is based upon Castrol's conduct involving the attempted acquisition of business opportunities with the above mentioned potential customers.

[44] *See* SLS's Response Brief in Opposition to Castrol's Motion for Summary Judgment, p. 25.

[45] *Id*.

[46] *Id.*

that SLS would have Castrol products to meet their needs.[47] Castrol was clearly knowledgeable of the potential business agreement between SLS and the mines. However, knowing that SLS needed Castrol's support to acquire the potential business, Castrol refused to supply the product and instead cut SLS out of the deal, thereby inhibiting the ability of SLS to fulfill its obligation and close the deal with the mines.[48] The crux of SLS's argument for tortious interference is that, like Utah Foam, Castrol continually gave the outward appearance of playing a role of assisting SLS; SLS contends that Castrol used SLS to build the business relationships and communicate the value of Castrol products to the potential customers and then used those connections to divert the business from SLS and acquire it for itself.

Upon consideration of the evidence, the Court concludes that Castrol has failed to show that no genuine issues of material fact exist or that it is entitled to judgment as a matter of law. In fact, the Court has determined that there certainly exist genuine issues as to whether or not Castrol's conduct involving discussions pertaining to acquiring the business of Peabody, Arch, and KUC and its alleged attempt to acquire the business by allegedly taking advantage of SLS's business relationship with them amounted to tortious interference. Therefore, summary judgment is due to be

---

[47] *Id*. at 12-14.

[48] *Id.*

19

**DENIED** as it pertains to tortious interference involving  Peabody, KUC, and Arch.

Taft and Drummond

Castrol argues that it was under no obligation to sell products to SLS after March 31, 2000, and, therefore, Castrol could not have interfered with SLS's business relations with Taft or Drummond.   SLS asserts that Castrol committed tortious interference by its failure to continue to supply product to SLS for the equipment at Taft and refused to fill orders that Drummond placed with SLS in the spring, summer or fall of 2000.   Under Alabama law, "an affirmative or threatened act of interference, as distinguished from a refusal or failure to carry out a particular promise, is an essential element of a cause of action for tortious interference with business relations." *Griese-Traylor Corp. v. First National Bank of Birmingham*, 572 F.2d 1039, 1045 (5th Cir. 1978)(citing *Alabama Power Co. v. Thompson*, 178 So.2d 525, 528 (Ala. 1965))[49]. SLS has failed to provide the Court with evidence of any affirmative act on the part of Castrol in connection with Taft or Drummond that would amount to tortious interference.   Therefore, based on the evidence and in accordance with Alabama law, summary judgment is due to be **GRANTED** as to tortious interference as it pertains to Taft and Drummond.

---

[49] Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this Court.  *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

El Cerrejon[50]

SLS asserts that Castrol tortiously interfered with SLS's business relation with El Cerrejon by failing to sell product to SLS for the El Cerrejon Mine during the term of the Agreement despite the fact that the mine is located in Colombia.

Castrol argues that there was no business relationship between SLS and El Cerrejon.  However, SLS asserts that Mr. Stewart provided specific testimony as to how the relationship with El Cerrejon was developed and as to the terms of the agreement that SLS reached with management of the El Cerrejon mine.[51] Specifically, Mr. Stewart testified that SLS submitted a written proposal to El Cerrejon and that he received "a verbal commitment from the maintenance management and from the purchasing management and operations group that were at the mine site in Columbia...[sic]"[52]  Moreover, SLS provided the Court with affidavits which included testimony confirming that it was common practice for SLS and others in the same industry to obtain business by making agreements through the customers' maintenance

---

[50]The Court has fully considered the briefs pertaining to the letter sent by Mr. del Castillo submitted by Castrol as evidence for the (doc. 198 ) Motion for Summary Judgment.  However, the Court must consider its previous Order concerning the multiple interpretations of the exclusivity provision.  Therefore, although there is a dispute as to whether or not SLS had a business relationship with El Cerrejon, even assuming there was a relationship, under Alabama law, it is irrelevant as it pertains to a claim for tortious interference.

[51] *See* Stewart February 22, 2005 depo., pp 207-215.

[52] *Id*. at 210.

departments such as what SLS alleged occurred between El Cerrejon and SLS.[53]

Subsequent to SLS's filing its Responsive Brief and Evidentiary Submissions, Castrol submitted a letter dated May 18, 2005 written by El Cerrejon's Alberto del Castillo.[54]  The letter alleged that El Cerrejon had not had any business relationship with SLS.[55]  Thereafter, SLS filed a response to Castrol's  El Cerrejon letter in which it notified the Court that Mr. del Castillo was not present during any of the meetings SLS had with El Cerrejon personnel;  therefore, Mr. del Castillo would be unable to dispute any of SLS's claims based upon any firsthand personal knowledge.[56]

Although SLS has provided the Court with sufficient evidence that a relationship existed between SLS and El Cerrejon, the Agreement explicitly lists Colombia as an *additional* Market Area.   In the Court's previous Order, it determined the following:

> "[t]here are at least two interpretations of the Agreement that the Court finds would be reasonable under the circumstances.  The first is that offered by SLS: the Agreement created an exclusive distributorship relationship between SLS and Castrol as to all products listed in Exhibit A, both as to industrial accounts in the Primary Market Area and accounts in the Additional Market Area, so long as

[53] *See* Stewart Affidavit, p. 8-10; see also Randall Scott Affidavit, p. 7-8.

[54] *See* El Cerrejon Letter.

[55] *Id.*

[56] *Id.*

those accounts were for "Surface and Deep Mining and selected industrial accounts." The second is that offered by Castrol: the Agreement created an exclusive distributorship relationship between SLS and Castrol as set out above, except that the exclusive provisions apply only in the Primary Market Area. As the issue is before the Court on Castrol's Motion for Summary Judgment, the Court must adopt the interpretation advanced by SLS."[57]

Under Alabama law, an action for tortious interference does not exist where the action involves a contract that is ambiguous and susceptible of two meanings.[58] *Massengill v. Malone Freight Lines*, 538 So.2d 784, 786 (Ala. 1988)(the Supreme Court of Alabama found that the contract was susceptible to two reasonable interpretations and, therefore, no one could have intentionally interfered with the contract). In the present case, Castrol maintains one interpretation of the provision regarding the exclusivity provision as it pertains to product distribution and sales in Colombia and SLS maintains another. Castrol argues that its conduct was clearly within the scope of its reasonable interpretation of the contract provision as recognized by the Court's Order.

---

[57] *See* December 15, 2004 Memorandum Opinion and Order, p. 8.

[58] This is not applicable to the tortious interference claim in connection with Peabody, KUC, or Arch because the interference cause of action is not based on the part of the Agreement that is susceptible to more than one meaning. SLS's allegations are centered around Castrol's conduct involving its allegedly underhanded business acquisition maneuvers. Whether or not there was an obligation of exclusivity is irrelevant in terms of SLS's argument pertaining to this claim.

The Court explicitly stated that there are at least two interpretations that the Court would find reasonable.  Therefore, the contract, as it pertains to the exclusivity of distribution for additional market areas, is clearly susceptible to more than one meaning.  Even viewing the  evidence in the light most favorable to SLS, the Court concludes that Castrol acted consistent with a reasonable interpretation of the provision and, under Alabama law, concludes that summary judgment is due to be **GRANTED** for the tortious interference claim as it pertains to El Cerrejon and the exclusivity provision of the Agreement.

## III.   The Statute of Limitations

Finally, Castrol asserts that pursuant to Ala.Code 1975, § 6-2-38, SLS's claims of tortious interference in connection with Peabody, KUC, and El Cerrejon are barred by the two-year Statute of Limitations.  Under Alabama law, a claim for tortious interference is subject to a two-year statute of limitations; therefore, the claim must be brought within two years of when it accrues.  *See Jennings v. City of Huntsville*, 677 So.2d 228, 230 (Ala. 1996) (citing Alabama Code § 6-2-38(1))[59].  In *Garrett v. Raytheon*[60], the Alabama Supreme Court stated the principal rule of law: "[t]he very basic and long settled rule of construction of our courts is that a statute of limitations

---

[59] The parties have stipulated that Alabama law applies to SLS's claims.

[60] No longer good law for a different point of law.

begins to run in favor of the party liable from the time the cause of action 'accrues.' The cause of action accrues as soon as the party in whose favor it arises is entitled to maintain an action thereon." *Garrett v. Raytheon*, 368 So.2d 516, 518-519 (Ala. 1979) *(citing Moon v. Harco Drugs, Inc.,* 435 So.2d 218, 220 (Ala. 1983). The time for filing a claim for intentional interference begins to run "on the date upon which the plaintiff sustained the alleged injuries." *Jennings v. Cit of Huntsville*, 677 So.2d 228, 230 (Ala. 1996).[61] "When a claim accrues, for statute of limitations purposes, is a question of law if the facts are undisputed and the evidence warrants but one conclusion. However, when a disputed issue of fact is raised, the determination of the date of accrual of a cause of action for statute of limitations purposes is a question of fact to be submitted to and decided by a jury." *Jim Walter Homes, Inc. v. Kendrick*, 810 So.2d 645 (Ala. 2001)(citing *Kindred v. Burlington Northern R.R.*, 742 So.2d 155, 157(Ala. 1999)).

The record indicates that SLS has alleged that Castrol's conduct, as it pertains to Peabody, KUC, and El Cerrejon, commenced in 1997.[62] SLS contends that although the initial contact commenced in 1997, SLS enjoyed a continuing business relationship with Peabody, KUC, and El Cerrejon and, therefore, the statute of limitations does not

---

[61] *Intentional* interference is synonymous with *tortious* interference.

[62] *See* SLS's Response in opposition to Castrol's Motion for Summary Judgment, p. 29.

bar its claims.[63]   Notably, SLS does not dispute that the injuries commenced in 1997, it simply wishes to build an argument on the basis of a continued relationship. However, SLS fails to provide the Court with any authority supporting its contention that its continuing business relationship amounted to a "continued tort" under Alabama law.  The Court is aware, however, of the circumstances recognized under Alabama law which amount to a "continuous tort".  According to *Moon*, a continuous tort occurs in one of three situations: (1) when an employer exposes its employee on a continuing basis to harmful substances and conditions; (2) when there is a single sustained method pursued in executing one general scheme; and (3) when a person contaminates a well or a stream.  *Moon*, 435 So.2d at 220-221.

SLS has provided the Court with evidence that Castrol's conduct may amount to a general scheme of interfering with SLS's [potential] business relationship with Peabody and KUC in order to acquire the business for itself.  Castrol has countered the assertion and argues that no claim for tortious interference exists at all.  The issue of whether and when an injury occurred is a matter that is heavily disputed in this case. Therefore,  the evidence must be weighed and the date of accrual remains a question of fact to be submitted to and decided by a jury. *Jim Walter Homes, Inc. v. Kendrick*, 810 So.2d  645 (Ala. 2001)(citing *Kindred v. Burlington Northern R.R.*, 742 So.2d

---

[63] *Id.*

26

155, 157(Ala. 1999)). Accordingly, Castrol's Motion for Summary Judgment based on the statute of limitations as it pertains to Peabody and KUC is due to be **DENIED**.

El Cerrejon

Castrol argues that SLS's claim of tortious interference in connection with El Cerrejon is time barred by the statute of limitations because the action  accrued in 1997. SLS argues that although injury commenced in 1997, SLS did not learn of Castrol's relationship with IQA, Castrol's other distributor in Colombia, until the commencement of this lawsuit.[64]   SLS asserts that Castrol had exclusive distributorship agreements with both SLS and IQA and that its conduct pertaining to the two distributors amounted to tortious interference.  SLS asserts that the statute of limitations for its claim as to El Cerrejon was tolled until SLS actually learned of the tortious interference.  Alabama courts have overwhelmingly rejected the "discovery rule" under which the cause of action does not accrue until the injury or damage is discovered.  *Garret,* 368 So.2d at 520.  As stated above, in Alabama,  the cause of action accrues and the applicable statute of limitations begins to run from the inception of the injury or damage.  *Brotherhood of Locomotive Firemen and Enginemen v. Hammett*, 140 So. 2d 832 (Ala. 1962).  This is the ruling regardless of whether the full

---

[64] *Id.*

amount of damages is apparent at the time of the first legal injury. *Kelley v. Shropshire*, 75 So. 291 (Ala. 1917); *Home Ins. Co. v. Stuart-McCorkle, Inc.*, 285 So. 2d 468 (Ala. 1973). However, it is imperative to emphasize that this "date of injury" rule does not apply where the fraudulent concealment by the defendant tolls the running of the statute. In the event of such fraud, the statute of limitations does not begin to run until the tort or injury is discovered or could have been discovered by due diligence. *Garrett,* 368 So. 2d at 516. SLS asserts that, in the present matter, Castrol's conduct in connection with its relationship with IQA was essentially that of fraudulent concealment. However, as was previously determined by the Court, Castrol's conduct was in accordance with its reasonable interpretation of the exclusivity provision in the Agreement and, therefore, the conduct did not amount to fraud. Accordingly, the Court finds that the claim accrued in 1997 and no evidence exists to suggest a tolling of the statute of limitations. Therefore, this claim is time barred by the statute of limitations and summary judgment is due to be **GRANTED** as to El Cerrejon.

## Conclusion

Based on the foregoing reasons, the Court has determined that as to the breach of contract claim as it pertains to Peabody, KUC, Arch, Taft, and Drummond, summary judgment is due to be **GRANTED** in favor of Castrol; and as to the breach of contract claim as it pertains to El Cerrejon, summary judgment is due to be

**DENIED**.  As to the claim of tortious interference as it pertains to Taft, Drummond, and El Cerrejon, summary judgment is due to be **GRANTED** in favor of Castrol; and as to the tortious interference claim as it pertains to Peabody, KUC, and Arch, summary judgment is due to be **DENIED**.

A separate **ORDER** will be entered.

**DONE** this 23rd day of May, 2006.


**VIRGINIA EMERSON HOPKINS**
United States District Judge