FILED

2006 May-23  PM 04:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **STEWART LUBRICANTS &** | ) | |
| **SERVICE COMPANY, INC., and** | ) | |
| **SLS WEST, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **2:00-CV-2845-VEH** |
| | ) | |
| **CASTROL INDUSTRIAL** | ) | |
| **NORTH AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**<u>Memorandum of Opinion</u>**

This matter comes before the Court on the Motion for Summary Judgment
(doc. 199) filed by Defendant Castrol Industrial North America, Inc., (hereinafter
"Castrol").  Castrol seeks summary judgment as to all claims asserted by  Stewart
Lubricants & Service Company, Inc., and SLS West (hereinafter referred to
collectively as "SLS") in connection with Decker Coal Company (hereinafter
"Decker") and to the intentional interference claim asserted in connection with
Kennecott Energy Group (hereinafter "KEG"). While this Court previously denied
summary judgment as to these claims in its December 15, 2004 Memorandum
Opinion and Order (hereinafter "Order"), Castrol requests that the Court "revisit"
these claims based upon  alleged admissions made during a period of supplemental

discovery.   Despite the fact that this would ordinarily be reviewed as a motion to reconsider, because the motions are in response to the evidence obtained during the supplemental discovery period[1], the Court will review this as a motion for summary judgment.

### Summary of Case

This case arises out of an April 1, 1996 Distributorship Agreement (hereinafter "Agreement") between  SLS and Castrol.

On April 1, 1996, Castrol and SLS entered into the Agreement pursuant to which Plaintiffs distributed or re-sold Castrol products in certain areas. Subsequently, there were several addenda to the Agreement.  In November, 1999, Castrol offered to continue to sell grease to SLS in the event that the Agreement was not renewed.   Castrol contends that SLS rejected that offer and that the parties continued to negotiate the terms of their relationship after the expiration of the Agreement.  SLS contends that it later accepted that offer and continued to operate under the assumption that there was an agreement in place.  In December 1999, Castrol informed Plaintiffs that it did not intend to renew the distributorship agreement effective April 1, 2000.  After April 1, 2000, Castrol continued to sell

---

[1]The Court was and remains satisfied with Castrol's response to the Court's Order to Show Cause as to why the motion should not be struck as untimely.

2

Castrol products to SLS for certain accounts.  At some point thereafter, the parties' relationship ended.

On October 10, 2000, Plaintiffs filed this lawsuit, which by amendment alleged the following claims: (1) breach of contract on seven different grounds based on the Distributorship Agreement; (2) fraud; (3) fraudulent suppression; (4) tortious interference; and (5) breach of contract based on the November 12, 1999 letter. Thereafter, Castrol filed five separate motions seeking summary judgment on each of the aforementioned claims.

On December 15, 2004, this Court entered the Order on Castrol's Motions  for Summary Judgment (doc. 183), granting in part and denying in part summary judgment as to Count One,[2] granting summary judgment as to Count Two, granting summary judgment as to Count Three, denying summary judgment as to Count Four, and granting  summary judgment as to Count Five.  Accordingly, SLS is left with two claims for breach of the Distributorship Agreement and one claim for intentional interference.

On January 14, 2005, the Court held a hearing on a motion filed by Castrol to preclude SLS from offering new evidence of its damages.  At the hearing, SLS

---

[2]The Court granted summary judgment on the breach of contract claim on five grounds and denied it on two grounds. The remaining two grounds are the two breach of contract claims at issue in the Motion currently before the Court.

disclosed the list of alleged customer accounts as to which it claimed damages and stated the amount of sales and profits allegedly lost for each account.[3]

On January 19, 2005, the Court denied the motion to preclude evience and entered an order instructing Plaintiffs to supplement their discovery responses relating to their alleged damages and to provide Castrol with a computation of damages as required by Rule 26 within seven days. Additionally, the Court allowed Castrol ninety days to take discovery on Plaintiffs' claims for damages.

On April 20, 2005 Castrol filed two motions for summary judgments. On April 21, 2005, the Court entered an Order to Show Cause as to why the motions for summary judgment shouldn't be struck as untimely. In response, Castrol explained that, for the first four years of this litigation, SLS refused to identify a list of the customer accounts as to which SLS claimed lost sales. SLS also refused to provide Castrol with a calculation of those damages. As a result, on January 19, 2005, this Court instructed SLS to supplement its discovery responses within the next seven days. The Court then re-opened discovery in order for Castrol to take discovery on SLS's new damages claim."[4] The April 2005 motions for summary judgment both pertain to SLS's new damages claim. One of the motions is the matter presently

---

[3]This was the first time SLS disclosed this information to Castrol.

[4] Castrol's Response to this Court's April 21, 2005 Order to Show Cause.

4

before the Court.[5]

## Relevant Facts

1.    On April 1, 1996, Castrol and SLS entered into the Agreement pursuant to
which SLS agreed to distribute and resell certain Castrol products.[6]

2.    During the term of the Agreement, SLS made sales to Decker, which is located
in Montana,[7] and is operated by the Kiewit Mining Group ("Kiewit").

3.    Kiewit also operates two other mines: (1) the Black Butte Coal Company in
Wyoming, and (2) Walnut Creek Mining Company in Texas. [8]

4.    During the term of the Agreement, Decker's mine manager began urging
Castrol and SLS to provide Kiewit with a bid that would encompass Decker
and the two other mines operated by the Kiewit.[9]   Decker's goal was to obtain
better pricing for Castrol's lubricants by having Kiewit purchase a greater
volume of product.[10]

5.    In 1999, a "District Wide Agreement" (hereinafter "DWA") was reached

---

[5] The Court has recently entered an order denying SLS's May 27, 2005 Motion for
Reconsideration (doc. 203) and, therefore, in accord with its December 15, 2004 Memorandum
Opinion and Order, the Court maintains that Castrol had no obligation to provide SLS with
product after the expiration of the Agreement.
[6] *See* December 15, 2004 Memorandum Opinion and Order, p. 1.
[7] *See* Williams Affidavit ¶ 2 and Romney Affidavit ¶ 2.
[8] *See Id.*
[9] *See* Romney Affidavit, ¶¶ 2 & 4; Plaintiffs February 22, 2005 30(b)(6) deposition, pp.
366-67.
[10] *See* Romney Affidavit, ¶ 4.

encompassing all three mines, including Walnut Creek Mining Company in Texas, which was undisputedly outside of Plaintiffs' territory.[11]

6.   Under the DWA, Castrol directly invoiced Kiewit for the products it purchased and then paid SLS a commission for the sales for which they participated.[12]

7.   SLS contends that the District Wide Agreement with Kiewit constituted a breach of the Agreement and constituted intentional interference with its relationship with Decker.[13]

8.   Anita Williams, the Decker employee primarily responsible for awarding the mine's lubricant contracts, testified by affidavit that she is "aware of no basis for any allegation that Castrol, or any representative of Castrol, interfered in any way with any relationship Decker Coal Company had with SLS West."[14] SLS does not dispute the accuracy of Anita Williams's testimony in this regard.[15]

---

[11]*See* Romney Affidavit at ¶ 4; Plaintiffs February 22, 2005 30(b)(6) deposition, pp. 366-67.

[12]*See* March 18, 1999 Memo from Castrol to Plaintiffs; *See* Stewart Dep., p. 370.

[13]Defendants aver that Plaintiffs negotiated the terms of the District Wide Agreement with Castrol, consented to the terms of that Agreement, performed pursuant to the terms of that Agreement, and were compensated pursuant to the terms of that Agreement. *See* Plaintiffs February 22, 2005 30(b)(6) Dep., pp. 369-72; *see also* January 6, 1999 letter from Plaintiffs to Castrol; March 18, 1999 memo from Castrol to Plaintiffs; and March 29, 1999 letter from Castrol to Plaintiffs.

[14]*See* Anita Williams Affidavit, ¶ 4.

[15]*See* Plaintiffs February 22, 2005 30(b)(6) deposition, p. 368.

9.   Ron Romney, Decker's mine manager, testified by affidavit that he is aware of no basis for any allegation that Castrol intentionally interfered with any relationship between SLS and Decker Coal Company.[16]

10.   On December 27, 1999, Castrol sent SLS a notice informing it that the Agreement would not be renewed, effective April 1, 2000.[17]  Castrol and SLS continued to engage in negotiations regarding the terms of their relationship subsequent to the April 1, 2000 expiration of the Agreement.[18]

11.    SLS contends that on February 13, 2000, it reached a verbal agreement with KEG for a five year lubricant supply contract allegedly worth in excess of $5 million in revenue.[19]

12.   On  February 14, 2000 Castrol sent a letter to KEG immediately after Castrol had been notified by SLS of the new contract between Kennecott and SLS.

13.   SLS contends that KEG chose not to proceed with that verbal agreement due to a letter that Castrol sent KEG on February 14, 2000 informing it that as of April 1, 2000, Castrol would have a new distributor.[20]

---

[16] *See* Ron Romney Affidavit, ¶ 5.

[17] *See* December 15, 2004 Memorandum Opinion and Order, p. 4.

[18] *See e.g.* Plaintiffs' March 16, 2000 Letter.

[19] *See* February 22, 2005 30(b)(6) deposition, p. 248; Plaintiffs' Third Supplemental Initial Disclosures, p. 1.

[20] *See* February 22, 2005 30(b)(6) deposition, p. 255.

14.    SLS had previously informed KEG that as of April 1, 2000, it would no longer

be a distributor for Castrol.[21]  Each statement in Castrol's February 14, 2000

letter was truthful.[22]

15.    As a follow up to the conversation between Castrol representative Mike Marr

and SLS president Rick Stewart, SLS sent correspondence to Mike Marr in

February of 1998, informing him that Decker Coal wanted to renew its

lubricant purchase agreement with SLS and wanted a two-year pricing

schedule .[23]

16.    Castrol refused to provide SLS with two-year pricing and instead would only

offer a twelve month pricing schedule.[24]

17.    After refusing to amend its pricing terms for SLS, Castrol offered a fifteen

month guaranteed pricing package, including additional discounts and

incentives directly to Kiewit.[25]

18.    Kiewit accepted the offer and the deal with SLS and Kiewit was never realized.

SLS therefore could not secure the Decker account either.

---

[21] *See* February 22, 2005 30(b)(6) deposition, p. 257-58; *see also* February 14, 2000 letter to Kennecott Energy Group.

[22] *See* February 22, 2005 30(b)(6) deposition, p. 258 ("Q: Can you point me to anything in this letter dated February 14, 2000 that is not true? A: No, sir.").

[23]  *See* BP 00342

[24]  Stewart Affidavit at ¶ 3 of Plaintiffs' Evidentiary Submissions for Peabody, et al.

[25]  *See* BP 00050; BP 00261

19.   While SLS had a contract with Decker and was the exclusive distributor for the territories of Wyoming and Montana, Castrol entertained Decker Coal employees without the participation of SLS.[26]

20.   In the Fall of 1999, Castrol employees worked with employees from Lubricant Management Services, Inc.  to provide service at Kiewit's Black Butte mine and, when SLS complained, Castrol agreed that its employees should not be "turning wrenches with Brad/Mark of LMS to make them look good."[27]

## Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a

---

[26] Stewart February 22, 2005 depo., pp. 362-64of Peabody, et al. Evidentiary Submissions; see also, Marr expense reports (*see e.g.*, 3/11/97, 5/19/97, 8/24/97, 3/19/98, 9/17/98)

[27] *See* BP 02318.

genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment

by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden

11

by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## Analysis

In its motion, Castrol contends that SLS has no grounds to bring an action for breach of contract or tortious interference.  Castrol further argues that SLS has not demonstrated that it has been damaged by the DWA.

### I. Breach of Contract

SLS alleges that Castrol breached its contract with SLS when it contacted customers and potential customers of SLS.  Specifically,  SLS alleges that Castrol breached the Agreement by improperly making direct contact with Kiewet/Decker [28].  Moreover, Castrol contends that SLS consented to the DWA and, therefore, has waived its right to pursue an action based on the DWA.

---

[28]Decker is operated by Kiewit.

Under Alabama law, to establish a breach of contract, a plaintiff must prove: (i) the existence of a contract; (ii) performance by the plaintiff; (iii) the failure of defendant to perform some action required by the contract or the performance of defendant of some action prohibited by the contract; and (iv) damages proximately caused by such breach. Moundville Lumber Co. v. Warren, 203 Ala. 488, 83 So. 479 (Ala. 1919).

SLS alleges that Castrol violated its Agreement with SLS and caused it pecuniary loss when Castrol sold directly to Kiewit.  SLS argues that by virtue of making the DWA agreement, Castrol breached the Agreement it had with Decker. According to the Agreement, SLS was granted the exclusive distributorship rights to Decker.  However, subsequent to the DWA, SLS allegedly became merely a pumping agent and Castrol became the distributor for Decker, thereby breaching the Agreement.

Furthermore, SLS argues that Castrol breached the Agreement with SLS by directly contacting Kiewit/Decker.  SLS argues that by sending a letter to Kiewit/Decker without the consent of SLS and prior to the expiration of the Agreement, Castrol violated an express provision of the Agreement.  Additionally, SLS contends that creating the DWA was a breach of the Agreement in that it was in direct communication with a customer of SLS.  Castrol argues that it had legitimate

economic motives and, therefore, it had a right to implement the DWA.[29]   SLS contends that in order to have such a right, Castrol would have to be SLS's competitor.   However, at the time the DWA was created, SLS was not a competitor of Castrol,  SLS was Casrtol's exclusive distributor until March 31, 2000. Seemingly, under the terms of the Agreement, Castrol was not entitled to directly contact any of SLS's customers until the expiration of the Agreement providing SLS with exclusive distributorship rights.  The Court finds that the Agreement, interpreted in the light most favorable to SLS, prohibited such conduct by Castrol.  The Court further finds that there is substantial evidence from which a jury could find that Castrol violated this prohibition.

Next, Castrol argues that SLS should be estopped from pursuing any claim based on the DWA because SLS consented to the DWA, thereby waiving its right to pursue an action based on it.   According to this Court's previous Order, "continued dealing without complaint as to a breach of a contract term constitutes waiver of that term."[30]  As support for this conclusion, the Court turned to the following quote from Williams on Contract:

> [W]aiver is generally defined in accordance with its

---

[29]*See Bridgeway Communications, Inc. v. Trio Broadcasting, Inc.,* 562 So.2d 222,223 (Ala. 1990)
[30] See December 15, 2004 Order, p. 9.

> usual meaning, as the voluntary and intentional relinquishment of a known and existing right.  Because waiver may be accomplished either expressly or impliedly through conduct, the term waiver has also been defined as either the express, voluntary, or intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment.

Castrol asserts the Court's previous conclusion is equally applicable to SLS's claim in connection with Decker and the DWA.  Castrol argues that because SLS depends on the DWA to calculate its damages, the evidence revealing SLS's consent to the DWA is sufficient to prevent the DWA from being the basis of the remaining breach of contract claim.

SLS maintains, however, that it did not in fact consent to the DWA and, therefore, there was no waiver.[31]  SLS submits that it was not in a position to negotiate with Castrol regarding the DWA because Castrol threatened to cancel the Agreement with SLS if SLS refused to perform or did not agree with the terms imposed by Castrol.[32]  SLS contends that it was ordered by Castrol to conduct itself as a pumping agent and was not given any other option.  SLS has provided the Court with sufficient evidence that it may not have willingly agreed to the DWA.

Accordingly, Castrol's Motion for Summary Judgment is due to be **DENIED**

---

[31] *See* Stewart Affidavit at 7.
[32] *Id.*

as to breach of contract as it pertains to Decker.

## II. Tortious Interference

SLS asserts that Castrol interfered with its relationship with KEG by sending a letter to KEG on February 14, 2000 informing it that, as of April, 2000, Castrol would have a new distributor.

Alabama law recognizes the tort of intentional interference with business relationships, including prospective business relationships.  In order to prevail on such a claim, a plaintiff must prove: (1) the existence (or prospect) of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) proximate damages.  *See Ex parte Alabama Dept. of Transportation*, 764 So. 2d 1263, 1270 (Ala. 2000).

SLS contends that as a result of the February letter, KEG decided not to enter into a lubrication supply agreement with SLS.  SLS argues that Castrol knew of SLS's relationship with KEG and intentionally obstructed SLS's ability to satisfy KEG's needs by refusing to enter into a supply contract with SLS and by sending the February letter.  Castrol contends that because the statements in the February letter are "undisputed" and are all truthful, it cannot give rise to a claim for tortious interference.  Moreover, Castrol argues that because SLS had previously notified

16

KEG that as of April 1, 2000, Castrol would have a new distributor, the letter does not constitute tortious interference.

SLS responds by arguing that it was Castrol's conduct with relation to the letter that was tortious interference.  Despite the truth of the statements, SLS argues that Castrol undermined SLS's business relationship with KEG by committing to supply product to SLS for the specific purpose of distributing it to KEG and then sending KEG a letter contradicting its prior statements.  SLS contends that Castrol has ignored the fact that KEG had agreed to a contract with SLS for SLS to supply KEG with Castrol product for five years based upon Castrol's assurances that it would continue to supply SLS with product after April 1, 2000.   The agreement was withdrawn by KEG upon receiving the February 14, 2000 letter from Castrol which indicated that Castrol would only supply Castrol lubricant through SLS's competitor LMS after April 1, 2000.

Based on the foregoing, the Court concludes that whether Castrol's conduct involving SLS's customer KEG amounted to tortious interference is a factual question to be determined by the jury.  Accordingly, summary judgment as to the claim of tortious interference is due to be **DENIED** as it pertains to KEG.

Next, Castrol argues that SLS lacks any grounds for a claim of tortious interference pertaining to Decker.  SLS submits that, as a function of the Agreement,

Castrol transferred the Decker account to SLS.  From that point on, the business of supplying Decker with lubricants belonged to SLS.  SLS contends that it was in negotiations with Kiewit for a new contract involving Decker. Castrol refused to provide SLS with two-year pricing and instead would only offer a twelve month pricing schedule.[33]  After refusing to amend its pricing terms for SLS, Castrol offered a fifteen month guaranteed pricing package, including additional discounts and incentives directly to Kiewit, an offer Castrol knew SLS would be unable to match.[34] Kiewit accepted Castrol's offer and the deal with SLS was never realized.  Therefore, by virtue of Decker being operated by Kiewit, SLS could not secure the Decker account either.

Castrol contends that, based upon the testimony of Decker employees Anita Williams and Ron Romney, Castrol could not have interfered with the SLS-Decker business relationship.  However, as previously decided by this Court, the affidavits of Williams and Romney are not sufficient grounds for granting summary judgment.

Castrol avers that the affidavits have a renewed significance in that Mr. Stewart has since admitted that the testimony in the affidavits is accurate.  However, SLS's arguments do not depend solely on the accuracy of the affidavits.

_____

[33] Stewart Affidavit at ¶ 3 of Plaintiffs' Evidentiary Submissions for Peabody, et al.
[34] *See* BP 00050; BP 00261

Accordingly, the Court finds that there is substantial evidence from which a jury could find that Castrol knowingly and tortiously interfered with SLS's relationship with Decker. Therefore, Castrol's Motion for Summary Judgment is due to be **DENIED** as to tortious interference as it pertains to Decker/Kiewit.

## III.   Damages

In its motion, Castrol asserts that SLS has been compensated for its work under the DWA. In its discovery responses, SLS asserts to have lost $47,000 worth of service sales and $34,000 worth of lubricant sales from Decker. Castrol argues that SLS has failed to demonstrate a basis for the numbers submitted or any evidence connecting the numbers to any alleged conduct of Castrol. SLS asserts that it has in fact offered evidence that they were damaged and has quantified those damages through written discovery, deposition, and supplemental initial disclosures. In its Reply Brief, Castrol contends that SLS's supplemental response to the subject interrogatory as it relates to Kiewit/Decker consists of the statement "Plaintiffs were caused to become nothing more than a 'pumping agent' for Kiewit and, as a result, lost two years of service at Kiewit at approximately $23,500.00 per year," followed by a calculation. However, in its Brief, SLS set forth Castrol's alleged conduct that

gave rise to its contention that it lost a two year contract with Kiewit/Decker.[35]  It is evident to the Court that SLS bases its damages in connection with Decker on Castrol's alleged conduct surrounding the creation and enforcement of the DWA which is set forth in the record.  The Court finds that SLS has provided sufficient evidence to survive summary judgment on both the liability issue and the issue of damages.  Accordingly, summary judgment is due to be **DENIED** as it pertains to damages.

## Conclusion

Based on the foregoing reasons, the Court has determined that Castrol's Motion for Summary Judgment as to all claims asserted in connection with Decker Coal Company and as to the intentional interference claim asserted in connection with Kennecott Energy Group is due to be **DENIED**.

A separate **ORDER** will be entered.

**DONE** this 23rd day of May, 2006.


**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[35] *See* SLS's Second Supplemental Responses to Castrol's Second Set of Interrogatories, p.3 and SLS's Brief in Opposition of the Summary Judgment.